ORIGINAL

RECEIVED BY OVERNIGHT FILING

Cc: HG/RT/Filer

# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

USDC JUN 8 '21 5:06PM

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 08 2021

at 5 o'clock and 06 min. P M
MICHELLE RYNNE, CLERK

IFP SUBM.                    LS

|  |  |
|---|---|
| TANGEE RENEE LAZARUS | ) |
| Plaintiff | ) |
|  | ) Complaint |
| Vs. | ) |
| **CV21 00247** HG RT | ) |
| HAKIM OUANSAFI (individual and official capacity) ; | ) |
| STEPHANIE FO (individual and official capacity); and | ) |
| IOANE AH SAM (individual and official capacity) | ) |
| _____ | ) |

## ***COMPLAINT***

Plaintiff  Tangee Renee Lazarus, pro se, alleges as follows:

## ***NATURE OF ACTION***

1..     Tangee Renee Lazarus brings this action to seek the enforcement of the

provisions of the Fair Housing Act, as amended, 42 U.S.C. section 3601, et. seq.

1


Mailed On
Date   JUN 0 9 2021

This action is pursuant to 42 U.S.C. Section 3604, Discrimination in the sale or rental of housing on the basis of race, handicap and other protected classes; specifically, 42 U.S.C. 3604(f)(3)(B), 42 U.S.C. 3604(f)(3)(C) regarding denial of reasonable accommodations, and Section 818 of the Fair Housing Act making it unlawful to retaliate against any person because that person has made a complaint under the Fair Housing Act.

## *JURISDICTION*

2.     At all times relevant herein, Plaintiff, a mixed race African and Scottish American woman in her 40's was a resident of the City and County of Honolulu, Hawai'i and a tenant at KALAKAUA.

3.     At all times relevant herein, Defendant HAWAI'I PUBLIC HOUSING AUTHORITY, [hereinafter referred to as "HPHA"] principal place of business is in the City and County of Honolulu, State of Hawai'i. At all relevant times hereto Defendant HPHA is and was an office of the State of Hawai'i with responsibility for the safekeeping of residents of the Kalakaua Homes Public Housing [hereinafter referred to as "KALAKAUA"] pursuant to orders of the courts of the State of Hawai'i and is subject to liability pursuant to the State Tort Liability Act, H.R.S. Chapter 662 and/or Chapter 661.

4.     HPHA has an official policy of non-discrimination: HPHA helps provide

Hawaii residents with affordable housing and shelter without discrimination.

HPHA does not discriminate in admission or access to, or treatment or

employment, in its programs and activities." Although HPHA guarantees "fair

delivery of housing services" the actions and non-actions of its employees at

KALAKAUA from 2016 to 2021 (the present) contradict its own policy.

5.     At all relevant times herein HPHA's employees, agents and/or

representatives were acting within the course and scope of HPHA/ HPHA is liable

for the negligent and/or tortious and/or wrongful conduct of said employees, agents

and/or representatives . Specifically, Stephanie Fo and Ioane Ah Sam are being

sued in their individual and official capacities as managers of KALAKAUA homes

and the worst offenders whose actions and inactions allowed the most dangerous

actions to take place against the plaintiff.  Hakim Ouansafi is being sued in his

official and individual capacity as the executive director of HPHA, and failing to

supervise his employees or take action about their wrong doing once he was

personally made aware of their actions and inactions.

6.     All events done by the defendant described herein occurred within the City

and County of Honolulu, State of Hawaii, and within the jurisdiction of the Federal

District Court, District of Hawaii.

7.     Venue is proper in this judicial district because: (a.) the events giving rise to this action occurred in this judicial district; (b.) the property that is the subject of this action is situated in this judicial district; (c.) the defendants reside and work within this judicial district, and (d.) the discrimination and retaliation issues are federal question concerning the claims of violation of federal Fair Housing Act.

### *Background Statement of Facts*

1.     On or around October 2013 TANGEE moved into KALAKAUA, in a 0 bedroom or studio unit at 1538 Kalakaua. There were no problems at this building. Plaintiff qualifies to live in housing for the elderly or persons with disabilities due to a seizure condition, anxiety, and Post Traumatic Stress Disorder. Plaintiff wanted a larger unit and applied for a transfer to a 1 bedroom anywhere in Honolulu.  TANGEE was approved to move into a 1-bedroom unit in another building within KALAKAUA, 1541 Kalakaua Avenue, Unit 1012. Plaintiff moved into the building called Makua Ali'i July 1, 2014.

2.     When TANGEE moved into Makua Ali'i residents showed their displeasure by holding out their arms in front of the elevator doors in the lobby as if to block plaintiff from entering while making statements such as: "You wait" or "You take next elevator."  When TANGEE got on the elevator in spirt of their objections

4

some people would get off, others would again motion with outstretched arms when the elevator stopped on their floors as if to block the plaintiff while saying things like: "No, No, only Asians this floor." Or "She is such a piece of s**, management knows it to, and she will be out soon," or "This building has gone to the dogs."

3.      TANGEE noticed when she returned home quite often her neighbor Yung Sing Chong was in the hallway attempting to look in her living room through the windows. Tangee saw him with his hands on the windows, as if trying to remove the jalousie.  He always ducked inside his house. TANGEE could not speak to him because he spoke either Mandarin or Cantonese and not English.  TANGEE took her concerns about her safety to Public Housing Specialist (PHS) Jo Ann Takahashi.  Takahashi told TANGEE "a group" of residents on the 10th floor did not want a black woman living on "their" floor.  Takahashi did not confirm that Chong was a member of this group but shared this information to show that she was aware of the tensions.  Takahashi assured plaintiff she would speak to CHONG's family about him looking into her apartment windows.

4.      TANGEE was frightened by the hostility and the neighbor spying on her. Plaintiff requested the installation of locks on her jalousie windows in accordance with HPHA policy that windows accessible to common areas be able to lock.

There is a 2015 notation in plaintiff's file that locks were to be installed but the installation did not occur.

5.     In early 2016 a non-resident entered Makua Ali'i. He jumped to his death from the 19th floor. In response to this suicide management posted notices instructing residents to report any strangers to management, especially if they see anyone peering into windows, loitering, or disturbing the tenants.

6.     On or around August 01, 2016, managers Takahashi and Janice Mizusawa issued a Notice of Violation to TANGEE stating that she was thought to be engaged in prostitution and drug dealing from her 10th floor unit and further stated that if these activities were not discontinued TANGEE would be evicted. These allegations were based upon the observations of neighbors who saw visitors to TANGEE's unit. The Notice of Violation required TANGEE to meet with to discuss the allegations that TANGEE was engaged in prostitution and drug distribution from her unit. Mizusawa and Takahashi were to perform a unit inspection after the meeting between the plaintiff and these two managers.

7.     On August 11, 2016, TANGEE met with Takahashi and Mizusawa at which time they informed the plaintiff, who had no idea how these allegations had started, that residents had approached management to say that the plaintiff had many visitors. The residents went to management in response to the unauthorized guest

6

notice that was posted after the suicide of a non-resident who jumped to his death from the 19th floor. The managers informed Tangee that the allegations were powerful because the residents had approached in a group. The suspicions about Tangee arose from Tangee: 1. Having guests after midnight, 2. Having different male guests, 3. The sound of Tangee walking by their units in what sounded like high heels,  and 4. Tangee running the water in her bathroom after midnight. Takahashi said the neighbors thought Tangee had "something to do with the death" of the person who committed suicide, but Mizusawa would not allow discussion of this allegation by saying "No, we do not think that anymore."

8.     TANGEE pointed out that this was the second time the residents had approached in a group. The first time was when they complained about her being black and living on the 10th floor. TANGEE reminded management that none of the allegations were rules, and the only rule that had been broken had been her neighbor attempting to investigate her windows. TANGEE asked if management had taken any action about the threat to safety against her. Takahashi said no because the neighbor was justified to spy on her because of "what he was seeing."

9.     TANGEE told them they were both pandering to the racism of the tenants and holding her to different standards. There are no rules about guest visiting times, the acceptable gender for guests, there was no schedule for running water, no prohibition against high heels. Yet TANGEE was being threatened with

7

eviction. The threat was official and in writing, whereas the threat to TANGEE's safety was not acted upon.

10. TANGEE requested access to her tenant file and was not allowed to see her records until Mizusawa left and Stephanie Fo took over as manager in 2019. In May of 2019 TANGEE saw her file and took pictures of documents of managements actions against her. One version of the notes was complete, and the other was redacted with white out. Both versions were written by PHS Curtis Kaneoka.

11. In 2018 TANGEE discovered that there had been an August 01, 2016, meeting with tenants and management. By comparing the redacted with the unredacted version management attempted to conceal the fact that all the complainers were Chinese. Their names had been whited out, the presence of a Chinese language speaking interpreter had been whited out, and the alleged conversation with a "Cantonese speaking police officer" who had been investigating the suicide and who had allegedly spoke to Yung Sing Chong about Tangee who "implied that they [the Honolulu Police Department] know that Tangee has many male guests]. There is some doubt that Yung Sing Chong was sought out to discuss the plaintiff because the notes incorrectly state that the suicide occurred when the non-resident jumped from the 10th floor but in fact the

man had jumped from the 19th floor.  Any connection between the suicide and the plaintiff was invented.

12.     During the August 01, 2016, meeting Kaneoka wrote that management had asked for the neighbors to continue to spy on Tangee and invade her privacy by reporting future unfounded observations, including anything Yung Sing Chong heard through the bathroom wall because "he lives next door."

13.     When TANGEE examined her file, she also found a record from August 02, 2016, when management had called the Honolulu Police Department on TANGEE in "response to resident concerns." PHS Kaneoka wrote that the police officers told him that there were no rules about visiting time and number of visitors, yet PHS added this notation to TANGEE's permanent resident file.  In the unredacted notes Kaneoka wrote that he "overheard" the police officers talking to dispatch and overheard that Tangee had over 20 arrests.  In the redacted version this statement is covered by white out because it is illegal for state workers to add gossip to permanent records that are available for any other staff member to see.

14.     On August 03, 2016, there is an email from Jan Takahashi to Maximum Events Security instructing them to keep a log of TANGEE's activities and to increase patrols by her apartment.

15.     On August 11, 2016, there were notes from the meeting between TANGEE

and Mizusawa and Takahashi  handwritten by Takahashi and type written by

Takahashi.  In these notes, Takahashi notes in parentheses that the complaining

neighbors are "(Chinese)."  The reference to race was relevant because the meeting

was attended and supervised by Asians, the complainers were motivated by racism

for a second documented time.

16.     TANGEE accessed her resident ledger in or around December 2018.

TANGEE discovered a record of abuses by a management that had been

undermining her secretly.  TANGEE's ledger revealed that she had been double

charged, or improperly charged for repairs. When she complained about the

charges, management had to issue her credits, known as "adjustments." TANGEE

had so many improper charges she did not have to pay rent for six months.

17.     On December 23, 2018, TANGEE was punched in the back by neighbor

CHONG. Neighbor Santos Rosario was present for this attack and told plaintiff he

would provide management with a written statement describing the man punching

TANGEE.

II.     ***HPHA inaction encourages tenants under HPHA authority to commit***

***violence against plaintiff Tangee Lazarus, thus making full participation in***

***housing programs inaccessible to plaintiff***

18.     On or about March 2019 CHONG came out of his unit and punched

TANGEE when he heard her wheel her bicycle past his apartment to reach her own

unit.  Plaintiff called the police, made a police report, and told the police that the

new manager Stephanie Fo, had told her she was aware of the racism in  HPHA

managed properties, and she was going to take action.  Tangee trusted that FO at

that time and believed that Yung Sing Chong  was being referred for eviction so he

would not be a threat to her. That was the information Fo had emailed to

TANGEE.

19.     On or around May 29, 2019, neighbor Sandra Tautua put a roach infested

couch in front of TANGEE's door.  When TANGEE went to unit 1008 to find out

why she had put the couch in the hallway, TAUTUA threw bleach on her and

cursed at her.  TANGEE recorded the assault and put the video on YouTube to

preserve the evidence. TAUTUA said to TANGEE that she "knew" TANGEE was

engaged in prostitution.

20.     Stephanie Fo was now manager of KALAKAUA, and she made repeated

assurances that she was referring both TAUTUA and CHONG for eviction.  When

this did not happen, she responded to TANGEE'S emails with excuses about how

she could not reach witnesses and how Santos Rosario had refused to give a

statement.  Fo refused to accept a copy of the Rosario witness statement that had

been date and time stamped by the office when he submitted it.  After months of

stating the two assailants were going to be evicted pursuant to HPHA policy that

tenants agree to allow others to peaceably enjoy their units and HPHA would

affirmatively work with tenants to ensure that peace.  However, HPHA policy

states that If tenants could not be reasoned with HPHA policy was to transfer the

offending tenant.

21.    TANGEE had been assaulted December 2018, March 2019, and May 2019.

There was a witness to the first assault, a police report about the second assault and

a video of the attack with bleach that constituted the third assault.  The same

neighbors who characterized TANGEE as a danger to them were in fact assaulting

her and management took no action.  That is why TANGEE exercised her right to

seek a remedy with HUD, the Fair Housing Rights enforcement branch.

22.    On July 07, 2020, TANGEE filed a complaint with the civil rights

enforcement branch of HUD by sending an email to HUD Regional Manager Ryan

Okahara.  Okahara declined to allow plaintiff access to HUD's Fair Housing

Rights enforcement powers because HPHA refused to turn over the documents in

plaintiff's file that prove her allegations about discrimination. TANGEE's July 17

2019, email to Okahara  detailed the racially motivated discrimination beginni'

with: **(1.)  management's solicitation of observations about plaintiff fr**

**tenants and security staff,  (2.) management's pandering to the raci**

**Chinese tenants by putting their allegations about plaintiff into '**

permanent record and sharing their observations with security staff and the police. (3.) KALAKAUA staff gave unfounded allegations the weight of fact by issuing a violation against the plaintiff and threatening her with eviction because of allegations; (4.) discrimination on the basis of disability in violation of FHA and Americans with Disabilities Act by management's refusal to honor the March 2019 approved reasonable accommodation by implementing security features for the accessible windows despite plaintiff's repeated pleas because of unauthorized entry into her unit. (5.) Plaintiff explained the rules that were created only for the plaintiff such as the violation of non-existent guest visiting hours; and (6.) the differential application of rules such as management offering protection from the perceived threat of plaintiff's existence while (7.) offering no protection to the plaintiff from actual threats when HPHA staff at KALAKAUA refused to secure accessible windows and refuse to discipline/evict assailants.

23.    Okahara refused to conduct a meaningful investigation by looking at the records in plaintiff's files. Instead, he claimed that he asked KALAKAUA management, the offenders, if the allegations of discrimination were true. KALAKAUA management told him the allegations were untrue. Okahara believed then-manager Stephanie Fo when she denied discrimination. Fo said there were no records of residents or staff being asked to monitor plaintiff and he

said he believed management because those actions would have been discriminatory and "there is no room for discrimination" in HUD. Okahara said according to HPHA the two assailants would be referred for eviction, but he did not offer to follow up to see that outcome. Although his July 2019 letter ended with the standard invitation that plaintiff could follow up with him, he never responded to another email from plaintiff, and he allowed HPHA staff to deny her access to HUD's investigatory process. Plaintiff offered to show him the copies of the documents that proved discrimination, but he never responded to plaintiff again.

24. HPHA acknowledged the fact of the assaults and HPHA staff revealed that they knew they were supposed to take actions because they made false claims to Okahara that they were referring assailants for eviction. Okahara reported in his response to plaintiff's July 17, 2019, emailed discrimination complaint that HPHA said plaintiff's window locks had been installed.  HPHA never offered the requisite pictures to document the existence of the window locks because the windows were never secured, despite HPHA knowledge that they were supposed to honor the March 2019 Reasonable Accommodation.

*III. HPHA retaliated against plaintiff for exercising her right to complain immediately after plaintiff's July 17, 2019, complaint to HUD about discrimination by: (A.) Refusing to give relevant documents to HUD that appear in plaintiff's file; (B.) enlisting other tenants in the retaliation; (C.) violating plaintiff's privacy by contacting her provider without plaintiff's authorization or knowledge in violation of Hawaii Information Portability Protection Act (HIPPA); (D.) violating HPHA policy that requires tenants to do their own reasonable accommodation requests, and mailing a forged reasonable accommodation request to transfer to another property to plaintiff's provider (E.) using plaintiff's disabling anxiety to terrorize her into believing Stephanie Fo's threat written on the forged reasonable accommodation request that plaintiff would have to transfer to another location in order "to feel safe;" (F.) fraudulently affixing plaintiff's signature to the request for a reasonable accommodation to transfer to another property through photocopying (G.) Approving the forged request to transfer to another location to steer plaintiff to a relatively economically depressed area far from plaintiff's employment at the time, (H.) failing to affirmatively create an atmosphere of non-discrimination by refusing to move the assailants to a different location; (I.) using maintenance and unit inspections as a pretext to issue violations based upon false maintenance records about plaintiff's unit and (J.) these hostile and dangerous*

*actions had a chilling effect on plaintiff's motivation to freely speak and seek*

*help through the system that is supposed to protect her; and (K.) misusing*

*plaintiff's confidential tenant file to obtain the name of her therapist, weigh*

*plaintiff's record with unsubstantiated complaints as if they were facts, withhold*

*the record from investigators, and remove documents from the record once*

*management learned plaintiff was contemplating a lawsuit.*

24.     On or around December 2019, the neighbor Santos Rosario from unit 1203

in KALAKAUA, who had witnessed CHONG'S assault on TANGEE agreed to let

TANGEE video his recollection of Stephanie Fo's promise to retaliate against

TANGEE, and Fo's instructions to Rosario to join management in the retaliation.

Rosario hoped the existence of a video would deter management from retaliating

against him for helping plaintiff pursue her rights when he wrote the witness

statement for TANGEE after Yung , Chong's 2018 assault on TANGEE. During

the consensual video of Santos Rosario, he told TANGEE that manager FO had

approached him in the parking lot around August and told him that TANGEE had

filed a complaint "with the government saying there was abuse here." Because

plaintiff had made a confidential complaint about him taking her key. FO asked

him to withdraw his statement about CHONG hitting plaintiff since plaintiff had

complained about his involvement in unauthorized entry into her unit.

25.    FO also told Rosario that plaintiff was a prostitute and that Fo was going to

try to have her arrested but he had no information about how Fo planned to have

plaintiff arrested.

26.    Plaintiff received a "right to sue letter" from the Hawaii Civil Rights Center

in December 2019, demonstrating her timely submission of complaints about

discrimination in KALAKAUA.

III.    Management used the tools for inclusion as weapons of retaliation against

plaintiff for complaining about civil rights violations.

27.    On or around August 01, 2019, plaintiff received an approved transfer

request to the next available unit in the Honolulu area.  Plaintiff had never

submitted a reasonable accommodation requesting a transfer to another project.

FO had written it for plaintiff without her knowledge and FO had contacted the

provider in plaintiff's file and sent her the reasonable accommodation request

asking if plaintiff could move to another residence. The reason for the requested

transfer was "to feel safe," a threat and abdication of contractual responsibilities.

FO used TANGEE'S feeling of being threatened by the other tenants as

ammunition in her forged Reasonable Accommodation Request to transfer

TANGEE to a different housing project.

28.    TANGEE'S therapist wrote her a letter saying she had signed the transfer request even though it did not come from TANGEE because she was afraid if she did not management would take away TANGEE'S housing:

29.    "Hawaii Public Housing Authority mailed provider a "Certificate for Reasonable Accommodation Modification" with signed consent form. Provider attempted to call, text, and email client to confirm.  Reasonable request was a transfer for client to move to "another unit, specifically in the Honolulu area" Request form was due 14 calendar days from receiving. Provider filled out form and attempted to contact client one more time by phone.  Provider will mail request form by due date August 13, 2019, because it appears that client will lose reasonable accommodation if form is not received.  Client has been reporting a lot of violence towards her in her building.  She showed me a video of a neighbor attacking her with bleach.  I believe the client will be safer moving to a different housing since it appears she is not getting any help from management."

30.    FO suggested in emails to TANGEE that TANGEE "would be more comfortable transferring" because of the assaults and harassment that she herself encouraged.

31.    In a video (shared to YouTube) defendant Tautua is filmed outside of TANGEE'S apartment, harassing plaintiff as she "mops." Defendant repeatedly

says she is allowed to be outside of TANGEE'S unit. "Ask the office, they told me it was okay.," said defendant. The plaintiff had been told by FO and PHS Marisa Castagna to avoid Tautua's unit while instructing Tautua on how to construct a pretext to harass plaintiff without getting herself in trouble.

32.    Ioane Ah Sam took over as manager of KALAKAUA in late 2019. Based upon the notes from management in plaintiff's file documenting allegations as if they were facts as far back as 2016, Ah Sam told plaintiff that "other managers have had problems with you."

33.    Plaintiff was worried that Stephanie Fo was making a threat when she wrote plaintiff needed to transfer in order "to feel safe" so she went to her provider and officially received an approved reasonable accommodation to have the locks installed on windows accessible to the public in 2019. Ah Sam and Castagna continued (and continue) to refuse plaintiff's request for secured windows despite documented break ins in the building. They both assured her that the two neighbors were in the process of being evicted but nothing happened.

34.    Ah Sam allowed plaintiff to access her file when plaintiff wanted to see if any of the assaults were recorded. None of the assaults against plaintiff were recorded but all the allegations against the plaintiff were in her file. Ah Sam had removed some of the records, apparently unaware that plaintiff had copies and was

19

testing him to see if he would deny her the complete file. Ah Sam refused to allow plaintiff to access the records in her file that detailed the meeting between management and tenants, claiming plaintiff could not make additional copies because those records mentioned other people by name. AH SAM did not remove the documents from the file, nor did he have corrections made to misstatements, double hearsay, and unconfirmed allegations.

35. On March 13, 2020, neighbor CHONG committed his third assault against TANGEE by hitting her repeatedly with a mop, while shouting in Cantonese "I will hit you with this stick until you are dead." Plaintiff always videotaped any setting where she saw her assailants, so she was able to get this attack on film that again was preserved on YouTube. CHONG assaulted plaintiff until AH SAM arrived to pull him away.

36. Castagna also arrived and told CHONG and his son that they were welcome to make complaints about plaintiff to the office. AH SAM and CASTAGNA are on video telling the police not to arrest CHONG because management would handle him, but nothing ever happened.

37. While CASTAGNA and AH SAM were together, restraining CHONG to keep him from assaulting TANGEE again, TANGEE asked CASTAGNA if she had taken disciplinary action about the video (also preserved on YouTube) of

neighbor Barbara Burns and her unauthorized guest calling TANGEE "n****r" and threatening to "have people look for you" after TANGEE had found them in possession of her stolen bicycle. CASTAGNA said she had declined to mention this to AH SAM.

38. Despite TANGEE informing management that she refused to be driven out, and that she had never given permission for Fo to submit a reasonable accommodation seeking relocation, management offered her a unit in a housing project in an area with fewer economic advantages that was quite far away from the job that she had at the time.

39. Castagna told TANGEE she could not do anything about the years long chronic roach infestation in TAUTUA's apartment even though the roaches pose an additional health threat with COVID-19 and the high-risk population in KALAKAUA because that defendant refused to allow her to enter the roach infested unit.

40. On May 28, 2021, two members of the Honolulu Police Department knocked on plaintiff's door at 7:00 a,m. to inform her that neighbor and assailant Sandra Tautua complained that she was afraid of the plaintiff. Plaintiff informed tenant liaison Marisa Castagna that the harassment continues from the violent neighbor and Castagna asked "what do you want me to do about it"? No one in

21

management pretends they are going to evict Tautua, and plaintiff is very afraid that people will hurt her because the tenants know there are no consequence for violence against the plaintiff.

41. Plaintiff wrote governor David Ige and HPHA executive director Hakim Ouansafi a letter she sent through the U.S. mail detailing the discrimination on the basis of race and disability as well as the retaliation for the exercise of her protected right to file a discrimination complaint but received no answer from either the governor or the executive director of HPHA.

42.    On June 03, 2021, plaintiff returned home to find her apartment had been entered and her belongings strewn about. The police noted that plaintiff's apartment is accessible through unsecured windows. Management does not respond to plaintiff's two-year-old request to implement the approved reasonable accommodation for locks on the windows.

43..    The defendants have taken actions, or have failed to act, and that has caused TANGEE to suffer emotional, psychological, and physical damages from the above intentional actions causing intentional and negligent infliction of emotional distress.

44.    KALAKAUAU management, who are employees of HPHA, aided and abetted tenants to discriminate on TANGEE in violation of Hawaii Revised Statute

§378-2: Discriminatory practices made unlawful; offenses defined. (a) It shall be an unlawful discriminatory practice: (1) Because of race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, reproductive health decision, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim's employer of such status or the employer has actual knowledge of such status:... (3) For any person, whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so;

45.     HPHA representatives use unit inspections of a tool for retaliation and steering by falsifying documentation such as the May 06, 2021, inspection notice the plaintiff found taped to her door at 8:55 a.m. that read she had missed the 9:30 inspection and maintenance could not enter the unit due to an unauthorized lock plaintiff had installed on the unit door. Plaintiff demanded the maintenance staff return to do a proper inspection, which he did, but he did not change his notes when plaintiff asked him to remove the language about the unauthorized lock. Anyone reading the notes would think plaintiff had committed an infraction making her eligible for eviction, especially if the reader did not know that time stamped pictures are supposed to accompany any violations.

## *Prayer*

1.      Tangee Renee Lazarus repeats and incorporates by reference the allegations set forth in all paragraphs above.

2.      The conduct of the HPHA described above constitutes:

a.      A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act.

Specifically, by failing to take adequate action to resolve complaints of racial harassment and violence, to diminish such harassment and violence, or to protect the complainant from racially and ethnically motivated harassment and violence, the HPHA:

b.      made unavailable or denied dwellings to the complainants and other persons because of race, color, or national origin, in violation of 42 U.S.C. § 3604(a).

c.      discriminated against the complainant in the terms, conditions, or privileges of rental of dwellings because of race, color, or national origin, in violation of 42 U.S.C. § 3604(b); and

coerced, intimidated, threatened, or interfered with the complainant, in the exercise or enjoyment of rights granted or protected by 42 U.S.C. §§ 3603, 3604, 3605, or 3606.

d.      By refusing to implement the reasonable accommodation for window locks HPHA continues to make unavailable the full use of housing programs for the plaintiff.

3. The discriminatory actions of the HPHA were intentional, willful, and taken in disregard for the rights of the complainant who was subjected to the HPHA's discriminatory housing practices.

Alternatively, the HPHA's discriminatory actions and failure to act were negligent with respect to complainant who was subjected to the HPHA's discriminatory housing practices because the HPHA knew or should have known about the harassment and violence and failed to take adequate measures to stop, prevent or correct the harassment and violence.

4. The complainant who was subjected to the HPHA's discriminatory housing practices are aggrieved persons as defined in Section 802(i) of the Fair Housing Act, 42 U.S.C. § 3602(i), who suffered actual injury and damages because of the HPHA's conduct as described herein.

WHEREFORE, Tangee Renee Lazarus prays for an Order from this Court that:

5.      Declares that the discriminatory housing practices of the HPHA, as set forth above, violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 - 3619.

25

6.    Enjoins the HPHA, its agents, employees and successors, and all other persons in active concert or participation with the HPHA, from:

a.    refusing to negotiate for the rental of, or otherwise making unavailable or denying, a dwelling to any person because of **race**...or **disability**.

b.     discriminating against any person in the terms, conditions, or privileges of rental of a dwelling because of race, color, national origin; or disability and

c.    coercing, intimidating, threatening, or interfering with persons, including the complainant, in the exercise or enjoyment of any right granted or protected by 42 U.S.C. §§ 3603, 3604, 3605, or 3606.

6.  Requires such injunctive relief against the HPHA as is necessary to effectuate the purposes of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.

7. Awards punitive damages to the complainant pursuant to 42 U.S.C. §1983; and

or such other relief as the court deems just and proper, and compensatory relief related to expenses of filing this action and expenses of security plaintiff was forced to install. *HUD civil penalties 107, 050 for 2 or more offenses in the last 5 years - total requested $214,100 from Fo. and Ah Sam.*

Respectfully Submitted

26

Dated: June 08, 2021,  Honolulu, Hawaii

/s/ Tangee Renee Lazarus

TANGEE RENEE LAZARUS

Pro Se Plaintiff

1541 Kalakaua Avenue

Unit 1012

Honolulu, Hawaii 96826-2482

Telephone: (808) 367-4278

Email: tangeelazarus@live.com

Tangee Renee Lazarus